UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SL-X IP S.Á.R.L., <br><br> Plaintiff, <br><br> -v- <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | No. 18-cv-10179 (RJS) <br><br><br> OPINION & ORDER |
| SL-x Technology USA LLC., SL-x Technology UK Ltd., and SL-x Trading USA LLC, <br><br> Plaintiffs, <br><br> -v- <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | <br><br><br> No. 19-cv-4885 (RJS) |

RICHARD J. SULLIVAN, Circuit Judge:

These consolidated actions arise from claims brought first by SL-x IP S.á.r.l. in Case No. 18-cv-10179 (the "Parent Action") and later by its subsidiaries, SL-x Technology USA LLC, SL-x Technology UK Ltd., and SL-x Trading USA LLC (together with SL-x IP S.á.r.l, "Plaintiffs" or "SL-x"), in a substantively identical complaint in Case No. 19-cv-4885 (the "Subsidiary Action"). Plaintiffs allege that a group of financial institutions (the "Broker Defendants") and their preferred provider for stock lending services, EquiLend, conspired to boycott a stock lending platform developed by SL-x in violation of applicable federal and state antitrust laws – specifically, the Sherman Act and New York's Donnelly Act. (Doc. No. 5 ("Parent Complaint" or "Compl.") at

¶¶ 307–22; Case No. 19-cv-4885, Doc. No. 1 ("Subsidiary Complaint" or "Sub. Compl.") at ¶¶ 317–32.)[1] Plaintiffs also bring claims under New York law for tortious interference with business relations, unjust enrichment, and a violation of the Deceptive Trade Practices Act ("DTPA"). (Compl. ¶¶ 323–36; Sub. Compl. ¶¶ 333–46.)

Now before the Court are Defendants' assorted motions to dismiss the Plaintiffs' claims. For the reasons set forth below, the Court grants Defendants' motion to dismiss the Parent Complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1); denies EquiLend Europe's motion to dismiss the Subsidiary Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2); grants Defendants' collective motion to dismiss Plaintiffs' federal and state antitrust claims in the Subsidiary Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that they are time-barred; and declines to exercise supplemental jurisdiction over the remaining state-law claims in the Subsidiary Complaint.

I. BACKGROUND

A. Facts

1. The Stock Lending Market and SL-x

These actions involve alleged misconduct in the stock lending industry. By way of background, a stock loan is a financial transaction in which a lender gives temporary ownership over shares of stock to a borrower (Compl. ¶ 68) – typically, a broker seeking to cover short positions – for a fee. *See QS Holdco Inc. v. Bank of Am. Corp.*, No. 18-cv-824 (RJS), 2019 WL 3716443, at *1

---

[1] Unless otherwise noted, all citations to the docket refer to entries in Case No. 18-cv-10179 (the "Parent Action"). The remaining defendants in the consolidated actions (collectively called "Defendants") are: Merrill Lynch Professional Clearing Corp;, Merrill Lynch L.P. Holdings, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated (together, "Merrill Lynch"); Credit Suisse AG; Credit Suisse Securities (USA) LLC; Credit Suisse First Boston Next Fund, Inc. (together, "Credit Suisse"); Goldman, Sachs & Co. LLC ("Goldman"); JP Morgan Securities LLC; J.P. Morgan Prime, Inc.; J.P. Morgan Strategic Securities Lending Corp.; J.P. Morgan Chase Bank N.A. (together, "J.P. Morgan"); Morgan Stanley & Co. LLC; Prime Dealer Services Corp.; Strategic Investments I, Inc. (together, "Morgan Stanley"); UBS AG; UBS Americas Inc.; UBS Securities LLC; UBS Financial Services Inc. (together, "UBS," and collectively with the preceding defendants, the "Broker Defendants"); and EquiLend LLC; EquiLend Europe Limited ("EquiLend Europe"); and EquiLend Holdings LLC (together, "EquiLend").

(S.D.N.Y. Aug. 6, 2019).[2]  Over one trillion dollars in securities move through this stock loan market every year.  (Compl. ¶ 75.)  Nevertheless, because there is no public exchange to facilitate these stock lending transactions, would-be lenders and borrowers are often in the dark as to the appropriate fees to be charged for their loans.  (*Id.* ¶¶ 77, 82–92.)

Around 2010, some electronic trading veterans founded SL-x and developed a patented online software designed to counteract the market inefficiencies resulting from the lack of transparency in stock lending transactions.  (Compl. ¶¶ 93, 106.)[3]  SL-x's software provided an "online platform where Broker-Dealers and Agent Lenders could post bids and offers for potential stock loan transactions."  (*Id.* ¶ 94.)  Users could view price data "in real time" and access information that was previously unavailable to the general public.  (*Id.* ¶ 95.)  Other features included direct messaging with multiple parties and anonymous transacting (*id.* ¶¶ 96–97), and the ability to lend European stock at a reduced counterparty risk and lower capital cost (*id.* ¶¶ 100–04).

2.  Defendants' Boycott of SL-x

While developing their company's software, SL-x executives contacted market players to generate interest in their product.  (*Id.* ¶ 111.)  According to Plaintiffs, "more than one" of the Broker Defendants initially "contemplated investing in the company."  (*Id.* ¶ 112.)  With the help of its investor, Palamon Capital Partners ("Palamon"), SL-x also reached out to Defendant EquiLend, a company that is owned and controlled by the Broker Defendants (*Id.* ¶¶ 110, 287) and "operates an

---

[2] The following facts are taken from the Parent Complaint in Case No. 18-cv-10179 and the Subsidiary Complaint in Case No. 19-cv-4885 (together, the "Complaints") and are assumed true for purposes of these motions.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In ruling on the motions, the Court has also considered Defendants' memorandum of law (Doc. No. 68 ("Mem.")), Defendant EquiLend Europe's memorandum of law (Doc. No. 65 ("EquiLend Mem.")), Plaintiffs' memorandum of law in opposition to Defendants' joint motion (Doc. No. 77 ("Opp'n")), Plaintiffs' memorandum of law in opposition to EquiLend Europe's memorandum (Doc. No. 75 ("Opp'n to EquiLend")), Defendants' reply (Doc. No. 88 ("Reply")), Defendant EquiLend Europe's reply (Doc. No. 83 ("EquiLend Reply")), and all exhibits attached thereto.

[3] Neither the Parent Complaint nor the Subsidiary Complaint specifies which SL-x entity initially created the software.  Although the Subsidiary Complaint introduces the plaintiffs in that complaint as "all direct or indirect subsidiaries" of SL-x IP S.á.r.l. – "a holding company that operated the SL-x business through [the subsidiaries]" – Plaintiffs otherwise fail to differentiate among the SL-x entities.  (Sub. Compl. ¶ 14.)

electronic bulletin board where Agent Lenders can post their stock inventory with a fixed price to borrow each stock." (*Id.* ¶ 116). Although SL-x offered to purchase EquiLend outright, EquiLend rejected that proposal out of hand and rebuffed "any further efforts at negotiation." (*Id.* ¶¶ 118, 120.) SL-x proceeded to contact the Broker Defendants directly and advertise itself as a competitor to EquiLend (*see, e.g.*, *id.* ¶¶ 121–22), but the Broker Defendants ultimately rejected SL-x's overtures, notwithstanding their previous expressions of interest in the SL-x platform (*see, e.g.*, *id.* ¶ 125).

At a meeting in February 2013, a Credit Suisse executive told Plaintiffs' representative that "EquiLend was like 'the mafia run by five crime families.'" (*Id.* ¶ 134.) That same executive later stated that Credit Suisse would "join" with SL-x only after "'the Big Boys' [ ] committed to the platform'" and warned that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry." (*Id.* ¶¶ 135–36.) Indeed, according to the Complaints, at various times between 2011 and 2014 representatives of the Broker Defendants described EquiLend as the gatekeeper to any deal with Plaintiffs. (*See, e.g.*, *id.* ¶ 168.)

Plaintiffs allege that Defendants entered into a secret agreement to boycott SL-x at EquiLend meetings where representatives from the Broker Defendants were present. (*Id.* ¶ 189.) Plaintiffs further allege that the Broker Defendants engaged in this boycott to perpetuate the lack of transparency in stock-lending transactions, which enabled them to "charg[e] exorbitant fees to connect borrowers and lenders and prevent[] either side from knowing the true 'cut' that Defendants charge as middlemen." (*Id.* ¶ 3; *see also id.* ¶ 81–82.) Plaintiffs also allege that as a result of the boycott, SL-x lost access to funding and new investors (*id.* ¶¶ 195–201), and was forced, in early 2015, to sell its patents to EquiLend "for a fraction of the true value of the company" (*id.* ¶¶ 201, 216).

B. Procedural History

SL-x IP S.á.r.l. filed the Parent Complaint on November 1, 2018. (Doc. No. 5.) On December

4

21, 2018, Defendants filed a joint motion to dismiss all claims in the Parent Complaint.  (Doc. Nos. 67, 68.)  That same day, Defendant EquiLend filed a separate motion to dismiss the Parent Complaint for lack of personal jurisdiction.  (Doc. Nos. 64, 65.)

In light of Defendants' argument that SL-x IP S.á.r.l lacked standing to pursue the claims of its since-dissolved subsidiaries, on February 5, 2019, SL-x IP S.á.r.l requested leave to file a supplemental declaration once it had revived its subsidiaries and assigned the subsidiaries' claims to SL-x IP S.á.r.l.  (Doc. Nos. 79, 80.)  The Court denied SL-x IP S.á.r.l.'s request.  (Doc. No. 87 at 2.)  Nevertheless, on April 18, 2019, after the subsidiaries had been revived, SL-x IP S.á.r.l. filed a letter seeking a pre-motion conference regarding its contemplated motion to join the subsidiaries as plaintiffs pursuant to Federal Rules of Civil Procedure 15(a)(2), 17(a), and 25(c).  (Doc. No. 90.)  At a pre-motion conference on May 17, 2019, the Court suggested that the parties engage in jurisdictional discovery to first resolve the standing issue presented in the motion to dismiss.  (Doc. No. 98 ("Conf. Tr.") at 7:9–13.)  The parties, however, rejected that proposal, whereupon the Court denied SL-x IP S.á.r.l's motion to amend its complaint without prejudice to renewal after a decision on the fully briefed motion to dismiss.  (*See id.* at 26–27.)

Subsequently, on May 24, 2019, the revived subsidiaries – SL-x Technology USA LLC, SL-x Technology UK Ltd., SL-x Trading USA LLC, and SL-x Trading Europe Ltd. – brought an identical suit of their own, the Subsidiary Action, which was assigned to my docket as related to the Parent Action.  Despite Defendants' previous opposition to a motion to join the subsidiaries in the initial action, Defendants consented to the consolidation of the two cases under Rule 42(a)(2) of the Federal Rules of Civil Procedure.  (Case No. 19-cv-4885, Doc. No. 12.)  In light of the parties' agreement to consolidate the Parent and Subsidiary Actions, the Court ordered that the actions be consolidated, and – per the parties' agreement – ordered that Defendants' motion to dismiss the Parent Complaint and Plaintiffs' opposition to that motion be deemed responsive to the Subsidiary Complaint.  (Case

No. 19-cv-4885, Doc. No. 25 at 2.) Defendants declined the opportunity to submit supplemental briefing. (Case No. 19-cv-4885, Doc. No. 41.) With that background, the Court now turns to those motions in this consolidated action.[4]

### III. DISCUSSION

The Court will address, in turn, (1) Defendants' joint motion to dismiss the Parent Complaint for lack of standing pursuant to Rule 12(b)(1); (2) EquiLend Europe's motion to dismiss the claims against it for lack of personal jurisdiction under Rule 12(b)(2); and (3) Defendants' joint motion to dismiss the Subsidiary Complaint for failure to state a claim under Rule 12(b)(6).

#### A. Standing

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Standing is a "core component . . . of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and whether a plaintiff has standing "is the threshold question in every federal case, determining the power of the court to entertain the suit," *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted).

Because "federal court[s] may resolve only [] real controvers[ies] with real impact[s] on real persons," we cannot hear claims that plaintiffs do not have standing to bring. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (internal quotation marks omitted). To establish Article III

---

[4] In 2018, a separate group of plaintiffs brought a class action against Defendants in the Southern District of New York, alleging many of the same facts now alleged here. That case, which is discussed in part below, is currently proceeding before Judge Failla. *See Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, No. 17-cv-6221 (KPF).

standing, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). More than one party can have Article III standing to assert a claim as long as each can individually establish the elements of standing.

The Second Circuit recently held that "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021). But even if a real party in interest is not named in the complaint, a case will not be dismissed for lack of standing if that party "ratif[ies], join[s], or [is] substituted into the action within a reasonable time. Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction." *Id.* A real party in interest lacks standing to sue if it lacks legal existence. *Id.* at 384. To determine the legal existence of party, we look to state law. *Id.* at 386.

Defendants argue that SL-x IP S.á.r.l. lacks Article III standing to bring the Parent Action because it does not own the claims it asserts. (Mem. at 6.) According to Defendants, the subsidiaries – now the plaintiffs in the Subsidiary Action – owned the claims and suffered the injury at issue in this case. (*Id.* at 6–8.) SL-x IP S.á.r.l. concedes that it did not own the claims at issue; nevertheless, it asserts that, as the "sole surviving SL-x entity" at the time the Parent Complaint was filed, it was the "legal successor in interest to all of its shuttered subsidiaries." (Opp'n at 5.) Although the subsidiaries have since been revived, "standing is to be determined as of the *commencement* of suit." *Lujan*, 504 U.S. at 570 n.5 (emphasis added). Thus, to meet the requirements of Article III standing here, either (1) SL-x IP S.á.r.l. must have suffered an injury at the time it filed the Parent

7

Complaint by virtue of its status either as a successor in interest or parent to the subsidiaries that owned the SL-x platform, or at least (2) the real parties in interest – the subsidiaries – must have existed at the time SL-x IP S.á.r.l. filed the Parent Complaint.

Nothing in the Parent or Subsidiary Complaint sheds any light on how or why SL-x IP S.á.r.l. is the legal successor in interest to its subsidiaries' claims. In fact, contrary to the assertions in the Plaintiffs' briefing, the Parent Complaint does not even allege that SL-x IP S.á.r.l. *is* the successor in interest to its subsidiaries; it neglects any mention of the subsidiaries whatsoever. *Cf. Wallert v. Atlan*, 141 F. Supp. 3d 258, 277–78 (S.D.N.Y. 2015) (concluding that plaintiff lacked standing to bring copyright claims because his complaint only alleged that he was the "successor in interest" to copyright rights, and not that he was assigned or transferred the rights pursuant to the governing copyright statute). The mere fact that SL-x IP S.á.r.l. was the parent of the injured subsidiaries is insufficient alone to establish injury here. *See In re Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973) ("Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained."); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 420 (S.D.N.Y. 2011) (concluding that parent lacked standing to assert claims of subsidiary); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-0722 (PAE), 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (collecting cases). SL-x IP S.á.r.l. has therefore failed to establish that it had standing to pursue its claims as a successor in interest or as a parent corporation.[5]

That leaves only the question of whether "a party with standing to prosecute the specific claim

---

[5] Since the Court concludes that SL-x IP S.á.r.l. does not have standing to bring the Parent Action, it need not address Defendants' alternative argument – which Defendants asserted only in connection with the Parent Complaint – that SL-x

in question exist[ed] at the time the pleading [was] filed." *Fund Liquidation Holdings*, 991 F.3d at 386. It is clear from the record that no real party in interest existed at the time the Parent Complaint was filed. Indeed, Plaintiffs have conceded that the subsidiaries did not exist when SL-x IP S.á.r.l. filed the Parent Complaint. (*See* Opp'n at 1–2 (explaining that "[SL-x IP S.á.r.l.] continued the SL-x business after winding down its former wholly-owned subsidiaries" and began reviving those subsidiaries only after Defendants asserted – in a response to the Parent Complaint – that only the subsidiaries had standing to bring this suit).) So, at the commencement of the Parent Action, there was no real party in interest in existence, and thus the requirements of standing under Article III were not met. *See Lujan*, 504 U.S. at 570 n.5; *Fund Liquidation Holdings*, 991 F.3d at 386–91. For these reasons, the Parent Complaint is dismissed.

That leaves only the Subsidiary Complaint, which EquiLend Europe seeks to dismiss for lack of personal jurisdiction and which all Defendants seek to dismiss for failure to state a claim.

B.  Personal Jurisdiction Over EquiLend Europe

Because "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)," the Court turns next to EquiLend Europe's personal jurisdiction argument. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant . . . ." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). "[W]here a court rules on a 12(b)(2) motion based on pleadings and affidavits, the plaintiff is only required to make a prima facie showing of jurisdiction over the defendant." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 440 (S.D.N.Y.

---

IP S.á.r.l. does not have antitrust standing. (*See* Mem. at 9 ("Even if Plaintiff possessed Article III standing, it would nonetheless lack antitrust standing because SL-x IP S.á.r.l. cannot sue under the antitrust laws to recover for injuries directly suffered by SL-x Trading Europe Limited and SL-x Technology UK Limited.").)

9

2008); *see Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). Personal jurisdiction may be either general or specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). General jurisdiction requires that a defendant's "affiliations with the State [be] so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (internal quotation marks and alterations omitted). Specific jurisdiction requires that a defendant have minimum contacts with the forum jurisdiction, such as when a defendant has "'purposefully directed' his activities at the forum and the litigation 'arises out of or relates to' those activities." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 136 (2d Cir. 2014) (alterations omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). If such "minimum contacts" with the forum are established, the Court must still be satisfied that "the assertion of personal jurisdiction would comport with fair play and substantial justice" under the Due Process Clause of the Constitution. *Id.*

Defendant EquiLend Europe claims that personal jurisdiction is lacking for two reasons. First, it notes that it is incorporated in the United Kingdom with its headquarters in London, preventing the exercise of general jurisdiction over it. (EquiLend Mem. at 1; Sub. Compl. ¶ 62.) Second, it asserts that the Court cannot exercise specific jurisdiction because Plaintiffs have failed to sufficiently establish that EquiLend Europe itself engaged in conduct directed towards the United States, let alone New York. (EquiLend Mem. at 1.) While the Court agrees that EquiLend Europe is not subject to general jurisdiction in New York, the same cannot be said for specific jurisdiction.

To be sure, Plaintiffs' Subsidiary Complaint makes few explicit references to EquiLend Europe, save for noting that "EquiLend Europe Limited has multiple officers and directors based in New York" (Sub. Compl. ¶ 64) and that certain members of EquiLend Europe's Board of Directors were also employees of the Broker Defendants (Sub. Compl. ¶ 294). Otherwise, the allegations contained in the Subsidiary Complaint make no distinction between the different "EquiLend" entities.

10

(*See, e.g.*, Sub. Compl. ¶ 67 ("[Defendants] also met and conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including at private dinners in New York City.").) Ordinarily, where a complaint conflates several entities and "make[s no] effort to allege that the conduct of one affiliate is attributable to the other[,]" group pleading will fail to establish personal jurisdiction for each defendant. *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018).

But the Second Circuit has recognized that specific jurisdiction may be established under a conspiracy-based theory, which provides that an alleged conspirator-defendant will be deemed to have "purposefully availed itself" of the laws of a forum – thus establishing minimum contacts – when that defendant or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82, 87 (2d Cir. 2018). Notably, Judge Failla considered a similar motion from EquiLend Europe in *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), and– drawing all inferences in the plaintiffs' favor – concluded that specific jurisdiction was proper under the conspiracy theory articulated in *Schwab*. *Id.* at 340. Judge Failla reasoned that because EquiLend Europe was alleged to be part of the conspiracy, "its co-conspirators' 'overt acts in furtherance of the conspiracy' may be imputed to it for purposes of exercising jurisdiction." *Id.* (quoting *Charles Schwab Corp.*, 883 F.3d at 87).

As in the case before Judge Failla, Plaintiffs here have alleged facts that support the exercise of specific jurisdiction by virtue of EquiLend Europe's alleged participation in a conspiracy to violate the antitrust laws. The Subsidiary Complaint alleges that the Defendants conspired in part through their board positions (Sub. Compl. ¶ 286) and identifies which of the Broker Defendants' employees served on the board of EquiLend Holdings LLC (the U.S.-based entity) and which served on the board of EquiLend Europe (*id.* ¶¶ 293–94). Moreover, the Subsidiary Complaint alleges that a UBS

11

representative told SL-x that "any agreement would need to be approved by James Buckland, the Global Head of Securities Lending for UBS and a member of the EquiLend Board." (*Id.* ¶ 172.) The Subsidiary Complaint also identifies Buckland as a director of EquiLend Europe; together, these allegations support an inference that EquiLend Europe – through its agent, Buckland – was a member of the alleged conspiracy. (*Id.* ¶ 294; *see also* ¶ 286, ¶ 158 (alleging that a JP Morgan employee, identified later in the complaint as a director of EquiLend Europe, "admit[ted] that 'there is general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend" (second alteration in original)); ¶ 63 (alleging that the "EquiLend entities operate under common corporate control and coordinate their business activities").)

Accordingly, the Court finds that the Subsidiary Complaint alleges sufficient facts to warrant the exercise of personal jurisdiction over Defendant EquiLend Europe. The Court therefore denies EquiLend Europe's motion to dismiss for lack of personal jurisdiction.

### C. Failure to State a Claim

Defendants contend that Plaintiffs' remaining claims must be dismissed because they are time-barred, and therefore fail to state a claim upon which relief can be granted. To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678; therefore, a

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555.  If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

1. Antitrust Claims

Claims brought under the Sherman Act are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b.  The same is true for claims brought under New York's Donnelly Act, a state antitrust statute modeled after the Sherman Act.  *See* N.Y. Gen. Bus. Law § 340(5).  Thus, Plaintiffs may recover on their antitrust claims only if they commenced this action within four years of "an act that injure[d] [their] business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Defendants assert that the statute of limitations has run on all of Plaintiffs' antitrust claims because the Parent Complaint was filed on November 1, 2018 (Doc. No. 1; *see also* Doc. No. 5), and because all injurious conduct alleged in the Complaints – with the potential exception of the sale of SL-x's patents in "early 2015" to EquiLend – occurred prior to November 1, 2014 (*See* Mem. at 12).[6] Plaintiffs counter that Defendants fraudulently concealed their conduct, thereby tolling those claims; they further argue that the 2015 sale constituted an antitrust injury that is actionable and timely.

"[A] motion to dismiss on statute of limitations grounds 'may be granted only if it is clear on the face of the complaint that the statute of limitations has run.'" *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *15 (S.D.N.Y. Oct. 7, 2019) (quoting *Fargas v. Cincinnati Mack, LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013)).  "In the context of a continuing conspiracy

---

[6] Whether the Court should view the four-year statute of limitations period as running from the filing date of the Parent Complaint (November 1, 2018) or that of the Subsidiary Complaint (May 24, 2019) was not addressed by either party following Plaintiffs' filing of the Subsidiary Complaint.  Because Defendants previously identified November 1, 2018, as the relevant filing date for purposes of their statute of limitations defense and do not now argue for the Court to treat May 24, 2019, as the relevant date – and because the outcome would be the same in any event – the Court will proceed to treat November 1, 2018 as the relevant filing date without further analysis.  (Mem. at 12; Opp'n at 19.)  [7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g., id.* ¶¶ 20–23, 27–29, 32–33).  *See* 28 U.S.C. § 1332(a), (c).

13

to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . [and] the statute of limitations runs from the commission of the act." *Zenith Radio Corp.*, 401 U.S. at 338.  This does not, however, "permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 333 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

Based on the Plaintiffs' allegations in their Subsidiary Complaint, the Broker Defendants initially expressed "enormous amounts" of interest in SL-x and its product (Sub. Compl. ¶ 117), but by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x (*see, e.g.*, *id.* ¶¶ 143–44, 148, 157, 166, 174).  The statute of limitations thus started running at the time of this alleged anticompetitive conduct.  *See Vitale v. Marlborough Gallery*, No. 93-cv-6276 (PKL), 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994); *see also Creative Copier Servs. v. Xerox Corp.*, No. 301-cv-155 (SRU), 2005 WL 2175138, at *2 (D. Conn. Sept. 2, 2005) (explaining that in some circumstances, "refusal[s] to deal" with a market actor may constitute anticompetitive conduct, and in the "refusal to deal" context the statute of limitations starts running when the refusal becomes final).

Of course, a statute of limitations may be tolled with a showing of fraudulent concealment.  *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

> To show fraudulent concealment, a plaintiff must prove: (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part.

*See In re Int. Rate Swaps Antitrust Litig.* (*In re IRS*), 261 F. Supp. 3d 430, 487 (S.D.N.Y. 2017) (internal quotation marks omitted).  A "plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840

F.2d at 1083. Fraudulent concealment must be pleaded with particularity "in accordance with the heightened pleading standards of Rule 9(b)." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 675, 688 (S.D.N.Y. 2016) ("In alleging fraud . . . under Rule 9(b), 'a party must state with particularity the circumstances constituting fraud . . . .'" (quoting Fed. R. Civ. P. 9(b))).

Plaintiffs assert that Defendants' pre-2015 conduct was inherently self-concealing *and* involved affirmative acts of concealment. (Sub. Compl. ¶ 305.) In support of these arguments, Plaintiffs point to Judge Failla's conclusion in *Iowa Public Employees* that Defendants' alleged conspiracy was inherently self-concealing "because the alleged conspiracy required numerous participants, was designed to endure, and depended on concealment for its success." 340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84). In contrast to the present case, however, the plaintiffs in *Iowa Public Employees* were *not* owners of the stock lending platforms that Defendants allegedly boycotted. In Judge Failla's case, the plaintiffs are a class of individuals and entities who entered into stock lending transactions with the Defendants. *Id.* at 298. Those plaintiffs allege that the Defendants threatened the Broker Defendants' own hedge fund clients to ensure that no one did business with other stock lending platforms. *Id.* at 334. Because the communications between the Defendants and their clients were not publicly available or disclosed, the plaintiffs in the *Iowa Public Employees* case had no way of knowing about the alleged threats. *See id.*

This case is quite different. Plaintiffs here were the owners of SL-x's intellectual property and have alleged that they were at meetings in which individual executives from the Broker Defendants clearly alluded to a conspiracy to freeze SL-x out of the market by boycotting it. For instance – and most starkly – Plaintiffs allege that: (1) in a February 2013 meeting, a Credit Suisse executive warned Plaintiffs that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139); (2) in July 2013, that same executive, when withdrawing his company's interest in the platform, cautioned that Credit Suisse would only be interested if "the Big Boys" were committed

15

to SL-x (*id.* ¶ 140) and that without EquiLend's approval, SL-x would not get a "foothold" in the industry (*id.* ¶ 141); (3) in August 2013, a J.P. Morgan executive "admit[ted] that there is general agreement among EquiLend Directors that industry advances should be achieved from within EquiLend and that JP Morgan participated in discussions with other banks about industry direction at EquiLend meetings" (*id.* ¶ 158 (internal quotation marks omitted)); and (4) in September 2013, a UBS executive extolled the "benefit of being 'inside the club' of EquiLend member banks to effectuate market changes" and implied that "any market transition" in the area of stock lending platforms "would need to come from inside EquiLend" (*id.* ¶ 173). The fact that executives of the Broker Defendants made these statements directly to SL-x representatives demonstrates that the alleged conspiracy did not "depend[] on concealment for its success." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84); *see In re IRS*, 261 F. Supp. 3d at 488 (observing that a conspiracy's object that "occur[s] in plain sight and in contrast to the market's expectations" would "if anything . . . have invited, rather than lulled, skeptical attention").

Even if Plaintiffs had alleged a self-concealing conspiracy – or, in the alternative, affirmative acts to conceal – their claim of fraudulent concealment would still fail because Plaintiffs were at least on inquiry notice of the conspiracy. In *Iowa Public Employees*, Judge Failla concluded that the plaintiffs had properly alleged both ignorance of the scheme and due diligence because the only notice the plaintiffs might have seen came from a "single instance of unverified media speculation" from which a reasonable person would not have made inquiries. 340 F. Supp. 3d at 336–37. The same cannot be said here. Although Plaintiffs insist that they did not discover the conspiracy until the *Iowa Public Employees* lawsuit was filed in August 2017 (Sub. Compl. ¶ 8), this allegation is belied by the statements contained in the Subsidiary Complaint, which Plaintiffs concede were made by Defendants' executives to representatives of SL-x in 2013. The warnings in these statements (i.e., that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139)) would make a

16

reasonable person suspicious enough to inquire further into the reasons why Defendants were rejecting the platform. And Plaintiffs' conclusory assertion that they "could [not] have discovered through the exercise of reasonable due diligence facts comprising its claims" (Sub. Compl. ¶ 305) is undermined by the apparent openness of Defendants' executives as to their plans to freeze SL-x out of the stock lending market. *Cf. Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703–04 (S.D.N.Y. 2019) (concluding that a failure to plead with particularity when the plaintiff became aware of the antitrust violation, or that the plaintiff had performed due diligence, precluded a finding of fraudulent concealment).

In addition to explicit statements made directly to Plaintiffs' representatives that should have raised red flags, the Subsidiary Complaint also makes general allegations about Defendants' conduct that suggest such conduct was "unnatural and contrary to expectations." *In re IRS*, 261 F. Supp. 3d at 489. For instance, Plaintiffs characterize certain entities' decisions to reject SL-x after showing initial interest as "unexpected[,]" "strange[,] and sudden[.]" (Sub. Compl. ¶¶ 204, 180.) Because such conduct, together with the statements allegedly made by executives of the Broker Defendants, was sufficient to put Plaintiffs on inquiry notice of the scheme, Plaintiffs cannot plead ignorance and due diligence. *See In re IRS*, 261 F. Supp. 3d at 489 (concluding that the plaintiffs were "[a]t a minimum . . . on inquiry notice" where the plaintiffs "had every basis, in real time, to smell a rat"). Accordingly, Plaintiffs' claims for relief based on the pre-2015 conduct are barred by the statute of limitations.

Having concluded that Plaintiffs failed to state a claim for any of the pre-2015 conduct alleged in the Subsidiary Complaint, the Court next turns to whether the 2015 sale of SL-x's patents to EquiLend constituted a separate antitrust injury. Plaintiffs allege that they sought investors for SL-x throughout 2013 and 2014, but that Defendants pressured potential buyers not to invest. (Sub. Compl. ¶¶ 200–06.) In 2015, "Defendants negotiated with SL-x's principal shareholder, Palamon, to

purchase the patents held by SL-x." (*Id.* ¶ 207.) Plaintiffs assert that "[w]hile SL-x was gone" at this point, Defendants still worried that a third party would purchase SL-x's technology and "engineer a potential competitor to EquiLend" (*id.* ¶ 208); to eliminate this threat, EquiLend purchased SL-x's intellectual property in "early 2015" for £500,000 (*id.* ¶ 209). Plaintiffs contend that EquiLend made this purchase with no intention of ever using SL-x's intellectual property, as evidenced by the fact that EquiLend performed little due diligence regarding the transaction in May 2015 and never attempted to use the technology in any of its products thereafter. (*Id.* ¶ 210.)

But even accepting Plaintiffs' allegations as true, as the Court must at this stage of the proceedings, it remains clear from the face of the Subsidiary Complaint that Plaintiffs have failed to establish an independent antitrust injury as a result of the 2015 sale. As noted above, "a separate cause of action accrues," and the statute of limitations restarts, for each distinct violation that injures the Plaintiffs. *Creative Copier Servs.*, 2005 WL 2175138, at *1. But "not every act by an antitrust defendant is sufficient to restart the statute of limitations." *Id.* (internal quotation marks and citation omitted). Rather, Plaintiffs "must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act," and (2) 'inflict[s] new and accumulating injury on the plaintiff.'" *Vitale*, 1994 WL 654494, at *5.

Plaintiffs claim they were injured because "Defendants' conduct . . . forced [SL-x] to close its doors and sell off its intellectual property for a fraction of the true value of the company." (Sub. Compl. ¶ 221.) But while EquiLend's purchase and subsequent shelving of SL-x's technology may have further reduced competition and protected Defendants' positions in the relevant market, that was an injury inflicted on would-be stock-lenders and borrowers – like the plaintiffs in *Iowa Public Employees* – not the Plaintiffs here. For Plaintiffs, the injury realized in the 2015 sale – lost profits on the sale of their patents and business model – was the direct result of Defendants' refusal to deal with Plaintiffs in the years prior to the sale. Had Plaintiffs sold their patents at fire sale prices to a

18

party other than EquiLend, or not sold them at all, they still would have realized the same injury resulting from Defendants' earlier anticompetitive conduct.  In the words of Judge Underhill in *Creative Copier Services,* Plaintiffs' injury here was merely the "abatable but unabated inertial consequence" of Defendants' pre-limitations period boycott of SL-x.  2005 WL 2175138, at *1 (quotation marks omitted); *see also Vitale*, 1994 WL 654494, at *5.  Because Plaintiffs have not alleged facts to show that the 2015 sale was an overt act causing a new and accumulating injury, they have failed to assert a cause of action within the four-year statute of limitations.  Accordingly, the Court grants Defendants' joint motion to dismiss Plaintiffs' federal antitrust claim in the Subsidiary Complaint.

The same is true for Plaintiffs' Donnelly Act claim.  The Court retains supplemental jurisdiction over Plaintiffs' claim under New York's Donnelly Act, as that state antitrust claim "overlaps completely with" Plaintiffs' federal claim.  *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 582 (S.D.N.Y. 2007); *see* 28 U.S.C. § 1367(a).  Because "the Donnelly Act was modeled on the Sherman Act and is generally to be construed in accordance with federal antitrust precedents," and because Plaintiffs do not argue that any policy or provision of state law requires a different result, Plaintiffs' "fail[ure] to allege sufficient facts in support of [their] Sherman Act claim[]" compels the conclusion that their "state law Donnelly Act claim based on the same conduct must also fail."  *TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752 (GBD), 2014 WL 1325914, at *10 (S.D.N.Y. Mar. 31, 2014); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 192–93 (S.D.N.Y. 2006).  Accordingly, the Plaintiffs' Donnelly Act claim is also time-barred, and the Court grants Defendants' joint motion to dismiss Plaintiffs' state antitrust claim.

### 2. Remaining State-Law Claims

With the dismissal of Plaintiffs' state and federal antitrust claims, all that remain are Plaintiffs' state law claims for tortious interference, unjust enrichment, and violation of the Deceptive Trade

Practices Act ("DTPA").  The Court declines to exercise supplemental jurisdiction over these remaining state law claims, and therefore "need not determine at this time whether those claims withstand Defendants' motion to dismiss." *Doron Precision Sys.*, 423 F. Supp. 2d at 193; *see* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").[7]  Accordingly, the Court dismisses Plaintiffs' tortious interference, unjust enrichment, and DTPA claims "without prejudice to renewal in the proper state court." *Id.*

## IV.  Conclusion

For the reasons described above, IT IS HEREBY ORDERED THAT Defendants' joint motion to dismiss is GRANTED as to both the Parent and Subsidiary Complaints.  The Clerk of Court is respectfully directed to terminate the motions pending at document numbers 64 and 67 of Case No. 18-cv-10179 and to close both Case No. 18-cv-10179 and Case No. 19-cv-4885.

SO ORDERED.

Dated:        September 30, 2021
              New York, New York

                                                    _____
                                                    RICHARD J. SULLIVAN
                                                    UNITED STATES CIRCUIT JUDGE
                                                    Sitting by Designation

---

[7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g.*, *id.* ¶¶ 20–23, 27–29, 32–33).  *See* 28 U.S.C. § 1332(a), (c).